**716**

In the Matter of Sterling R. DECKER and Mary Jane Decker, Partners t/a Berkeley Community Builders, Bankrupts.

No. 707.

United States District Court
W. D. Virginia,
Charlottesville Division.

Jan. 2, 1964.

William S. Aaron, Jr., Walker, Woodson & Aaron, James H. Michael, Jr., Michael & Dent, Charlottesville, Va., for Trustee.

Joseph W. Richmond, Richmond & Via, Charlottesville, Va., for petitioner.

MICHIE, District Judge.

This is the fifth petition for review that has come to me from the bankruptcy of Sterling R. Decker. The four previous petitions have all gone on to the Court of Appeals and I have every confidence that this one will, too.

In the Fall of 1962 Williston H. Clover (hereinafter referred to as "Clover, Jr.") became interested in purchasing from B. B. Woodson, Trustee in Bankruptcy of Sterling R. Decker and Mary Jane Decker, certain lots in a subdivision in the suburbs of Charlottesville known as Berkeley, in which the Deckers had been heavily interested. More than sixty lots were involved and Clover, Jr. offered to purchase them at a rate of five each two months, or faster at his option, at a price of $3,000 each. This offer is undated but it was approved by an order of the Referee dated November 6, 1962 which accepted the offer on the following conditions:

"(a) That where streets have not been constructed in said sub-division streets will be constructed in accordance with the requirements of the Virginia Department of Highways as lots are conveyed by the Trustee herein in accordance with said offer of Williston H. Clover;

"(b) That Williston H. Clover will file in this proceeding surety for the completion of said streets, with a suretor, or suretors thereon acceptable to and approved by the Trustee in this proceeding.

"(c) That this order is subject to any rights of Commonwealth Utilities, Inc., for use of well lots."

By addendum to the order, Clover, Jr. consented to its terms and conditions and agreed to be bound thereby. Commonwealth Utilities, Inc. was a utility company, supplying water and gas in Berkeley, originally owned by the Deckers but which other interests had been given an option to buy by the Trustee, which other interests were at the time managing the company.

For the security required by the above quoted conditions, Clover, Jr. entered into a bond, dated November 5, 1962, in the sum of $30,000, conditioned upon his performance of that part of the agreement to purchase which related to the con-

struction of streets in the subdivision. His father, W. L. Clover (hereinafter called "Clover, Sr."), was a surety on said bond.

Clover, Jr. purchased and paid for some of the lots covered by the agreement but found that they could not readily be sold at a price which would make the arrangement profitable to him and eventually defaulted on his contract.

The condition of the bond upon which Clover, Jr. was principal and Clover, Sr. surety was that "if said streets are not constructed in accordance with said contract between Williston H. Clover and bankrupt estate * * * " the principal and surety would pay to the Trustee in Bankruptcy the sum of $30,000 or so much thereof as might be necessary to complete the streets. Clover, Jr. found himself in a financial position in which he could not comply with the contract and construct the streets and Clover, Sr., as surety under the bond, was called upon to do so. Clover, Sr. declined to do so and the Referee under date of August 5, 1963 ordered, among other things, that the Clovers "severally or jointly" should within twelve days from the date of entry of the order begin the construction of the streets and roads in Berkeley as required by their contract. On August 15, 1963 the Clovers filed with the Referee a petition for review of that order of August 5, 1963. However, the Referee's certification on a subsequent petition for review states, with respect to this earlier petition: "The parties subsequently agreed that the Referee should not certify the petition for review until after further proceedings had been had."

On November 7, 1963, an order was entered after further proceedings which, after thoroughly reviewing the case and much of the evidence, provided that if the penalty of the bond plus certain costs were not paid to the Trustee in the Decker bankruptcy within twelve days from the date of the order, judgment would be entered against the Clovers in the amount of $30,000 plus certain interest and costs.

On November 18, 1963 Clover, Sr. filed in the office of the Deputy Clerk of this Court in Charlottesville a petition for review of the order of November 7, 1963. This petition was forwarded by the Deputy Clerk to the Referee at his office in Harrisonburg and reached him on November 20, 1963.

Section 39, sub. c of the Bankruptcy Act (11 U.S.C.A. § 67, sub. c), as amended by Public Law 86–662, approved July 14, 1960, reads as follows:

"c. A person aggrieved by an order of a referee may, within ten days after the entry thereof or within such extended time as the court upon petition filed within such ten-day period may for cause shown allow, file with the referee a petition for review of such order by a judge and serve a copy of such petition upon the adverse parties who were represented at the hearing. Such petition shall set forth the order complained of and the alleged errors in respect thereto. Unless the person aggrieved shall petition for review of such order within such ten-day period, or any extension thereof, the order of the referee shall become final. Upon application of any party in interest, the execution or enforcement of the order complained of may be suspended by the court upon such terms as will protect the rights of all parties in interest."

In In re Watkins, D.C., 197 F.Supp. 500 (1961), I held that a petition filed after the ten-day period expired could not be considered by the District Court. Judge Blumenfeld of the District Court for the District of Connecticut has likewise so held. See In the Matter of Middletown Packing Company, Incorporated, D.C., 199 F.Supp. 657 (1961).

However, in this case it happens that the tenth day fell on a Sunday, November 17th. The bankruptcy act expressly provides that in such an event the time for filing is extended to include Monday. 11 U.S.C.A. § 54. And see, to the same effect, Rule 6(a) of the Federal Rules of Civil Procedure. The filing was there-

fore in time if "filing" occurred when the Deputy Clerk received the petition.

The statute requires that the person aggrieved by the order of the referee must "file *with the referee* a petition for review". (Emphasis supplied) The petition in this case was filed with the Deputy Clerk in Charlottesville on November 18th. The referee resides in Harrisonburg and did not receive the petition until two days later. Can the petition be said to have been filed "with the referee" on November 18th? I have been unable to find any authority on this point and it seems to me a very close one. But in order to avoid deciding the important issues arising in this case on a doubtful technicality, and since on the merits of the case I shall reach the same result as I would reach if I held the filing improper, I shall pass to the merits of the case without ruling on this difficult question.

We come then to the merits of the case. At the time the bond was entered into by Clover, Jr. and endorsed by Clover, Sr., B. B. Woodson, Trustee in the Decker bankruptcy, was the owner of the lots involved. Commonwealth Utilities, Inc., an independently owned company, had installed the water and sewer lines in the subdivision. By contract dated October 31, 1962, a few days prior to the Referee's approval of the Trustee's acceptance of Clover, Jr.'s offer to purchase the lots, Commonwealth Utilities, Inc. and Clover Construction Company agreed that Commonwealth Utilities, Inc. would construct certain sewer and water lines to serve the lots so purchased by Clover, Jr. and that Commonwealth Utilities, Inc. would charge a connection charge for sewer and water connections at the rate of $200.00 per lot. This agreement was signed by Clover, Jr., Clover Construction Company, B. B. Woodson, Trustee, and Commonwealth, Utilities, Inc. As heretofore indicated, the bond which is the subject matter of this portion of this litigation was executed on November 5, 1962. The position of Clover, Sr. is that he was never told of any agreement with respect to connection charges for utilities; that Woodson, Trustee, had discussed the purchase with him some days before it was concluded and had not mentioned the connection charges; that Woodson was under some duty to advise him of all the circumstances of the transaction; and that he, Clover, Sr., therefore is not bound by the bond which he signed in ignorance of this phase of the agreement.

There is no suggestion that Woodson told Clover, Sr. anything that was in any sense false or untrue. The argument is merely that he failed to mention the connection charge in a conversation that he had with Clover about the matter.

The incident apparently principally relied upon by Clover, Sr. as a defense is stated in Clover, Sr.'s testimony as follows at pp. 53, 54 of the September 5, 1963 transcript:

"It was in front of the Court House, right across from the Monticello Hotel, on the street. And I had been carrying the bond in my pocket for a week, at least, and was repeatedly asked when I was going to sign it, and I didn't know whether I was.

"Q  You say you were repeatedly asked when you were going to sign it?

"A  Yes.

"Q  Who asked you?

"A  Billy asked me, and then I think Mr. Woodson did, on several occasions. And this was another time when he stopped and said 'How about it? We'd like to proceed', and so on. And I asked him what my liability was, in the event that I had to put the roads in. And he explained, I think, as he testified earlier, that—perhaps it was a little different, but as I recall, he said that they were afraid that Billy, due to his construction business, might not have the money available, or the credit available, to put the roads in when the roads were needed. So they needed some guarantee that these roads would be put in.

"I said 'Well, suppose I'm called on to put the roads in? What recourse do I have?' And he said, as he stated earlier, that I could take the lots back at Three Thousand Dollars per lot, and by selling them I could then recoup the Thirty Five Hundred Dollars, or Five Hundred Dollars per lot, and get back my cost of the road construction.

"And I did not sign it there in the street. It was a couple of days later. He came over, and I believe it was in my office that I finally signed it."

The same conversation is referred to in Mr. Woodson's testimony at page 25 of the same record and is to much the same effect.

Obviously, Clover, Sr. did not ask Woodson what his obligation on the bond was because both of them knew it was a maximum of Thirty Thousand Dollars, the precise amount depending on unknown events in the future; and presumably it was thought it would be zero. Obviously, what Clover, Sr. did ask was what his rights would be if his son defaulted. And Woodson gave him an entirely proper answer. Certainly there was nothing in any such question that would require Woodson to go into all of the details of the agreement, including the connection charge, all of which were well known to the parties and, Woodson had every right to presume, well known to Clover, Sr.

In Clover, Sr.'s brief it is said: "Once the trustee purported to describe the terms of the principal's obligations, he was bound by law to disclose to the surety all material facts. See [Atlantic] Atl. Trust [& Deposit] Co. vs. Union Trust Corp., 110 Va. 286 [67 S.E. 182] (1909)." In the case cited the following quotations are found:

"It is well settled that a person proposing to become surety for the conduct or contracts of another has a right to be treated with perfect good faith. The law does not as a rule, however, require that the party taking the surety shall seek out the surety and explain to him the nature and extent of the obligation; nor does it hold him responsible for fraudulent misrepresentations made to the surety by the principal, or by a third party, unless such misrepresentations are made with his knowledge or consent. * * * (citing authorities.)

"But it seems to be equally well settled that where, with the knowledge or assent of the creditor there is a misrepresentation to the surety with regard to any material fact which, if he had known, he might not have entered into the undertaking of suretyship, it will thereby be rendered invalid and the surety discharged from his liabilities."

In this case there was no misrepresentation of a material fact. There was at the most a failure to inform the surety of a fact which he could have readily ascertained by inquiry either from his son or, presumably, from any of the other persons concerned; and this in a conversation in which Woodson was not purporting to give the details of the contract but merely to point out in a general way a possible remedy for the surety in case of default.

Clover, Sr. did testify (Record September 5, 1963, p. 52) that his son told him the contract "did not include any sewer or water connection fees." But that is an ambiguous statement. For obviously, unless the contract expressly provided that no fee would be charged, the purchaser would have to deal at arm's length with the utility company.

Clover, Sr. also testified that in his own development work he did not charge a connection fee. Of course, if the price of a lot is put high enough, the connection fee may be considered as covered by the price. But some real estate developers may feel that it is better salesmanship to put a slightly lower price on the lot and charge a connection fee. And in this case, as Clover, Sr. undoubtedly knew, the utility company was not owned by the developer (Clover, Jr.) but was owned by the bankrupt estate subject

to an option to purchase by other interests.

It is worth mentioning that, though the bond in suit in this case was not signed until November 5, 1962, or at least was dated that date, the agreement with the utility company, setting the connection fee at $200.00 per lot, is dated October 31, 1962.

Furthermore, the connection fee for utilities might very well be regarded as a construction cost rather than a land cost since obviously no connection would be made until someone was building a house.

Mr. Clover, Sr. could have, and probably did, read before they were signed the contract of purchase and the separate contract for utility connections. Even if he was not shown the utility contract he would have known from the absence of reference to utility connections in the contract of purchase that there might be a charge for such connections. Nowhere in the contract of purchase is there any reference to a sewer or water connection fee or the absence of such. In the absence of any agreement on the subject the purchaser was obviously at the mercy of the utility company. And Mr. Clover, Sr. was well aware of this fact. Indeed he had himself negotiated a purchase of twenty lots in Berkeley, apparently before Decker's bankruptcy and when Decker owned the utility company as well as the lots. And that agreement specifically stated that there would be no sewer or water connection fee.

I conclude therefore that there was no obligation on Woodson, Trustee, the seller, in a casual conversation on the street to advise Clover, Sr., who could have had (if he did not actually have) copies of his son's contract available to read, that it did or did not contain any specific provision with respect to utility connections or anything else.

Again it is a point of some minor significance that this whole contract was not put through in a hurry and without adequate time for consideration. There was testimony that the agreement between Clover, Jr. and the bankrupt estate was reached as early as August 15, 1962 but not signed until November 6th.

Clover, Sr. argues that his son did not tell him about the sewer connection charge before he signed the guarantee —and that therefore he should be released from the guarantee. Just how the son's failure fully to inform his father as to what he was getting into can excuse him from liability to the other party who had no part in such conversation is a little hard to understand.

The order of the Referee is affirmed.