813 F.2d 400
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
FIRST AMERICAN BANK OF VIRGINIA, Appellee,
v.
Ronald O. KINDSCHI, Appellant,
v.
FUTURESOFT SYNERGIES, INC., Rardin, Kenneth D., Ganesa Group
International, Inc., Third-Party Defendants,
v.
John W. FREAL, Appellee.
FIRST AMERICAN BANK OF VIRGINIA, Plaintiff,
v.
Ronald O. KINDSCHI, Appellant,
v.
FUTURESOFT SYNERGIES, INC., Rardin, Kenneth D., Ganesa Group
International, Inc., Appellees.
and
John W. FREAL, Third-Party Defendant.
FIRST AMERICAN BANK OF VIRGINIA, Plaintiff,
v.
Ronald O. KINDSCHI, Appellee,
v.
FUTURESOFT SYNERGIES, INC., Appellant,
v.
RARDIN, Kenneth D., Ganesa Group International, Inc., John
W. Freal, Third- Party Defendants.
 Nos. 85-1498(L), 85-1803, 85-1882.
 United States Court of Appeals, Fourth Circuit.
 Argued July 16, 1986.
Decided Nov. 24, 1986.
 
 Before WINTER, Chief Judge, and HALL and SPROUSE, Circuit Judges.
 James E. Coleman, Jr. (Wilmer, Cutler & Pickering; Faith D. Ruderfer; Stephen W. Preston, on brief), for appellant.
 William T. Freyvogel (Adams, Porter & Radigan; Brian F. Kenney, on brief), Sally A. Hostetler (Odin, Feldman & Pittleman, P.C.), for appellee.
 SPROUSE, Circuit Judge:
 
 
 1
 This consolidated appeal involves a diversity action by First American Bank of Virginia (First American) against a guarantor of a note, Ronald O. Kindschi; impleader of the principal maker, FutureSoft Synergies, Inc., its President, Kenneth D. Rardin, and a bank officer, John W. Freal, as third-party defendants; and counterclaims by FutureSoft and Rardin against Kindschi. The district court awarded summary judgment for the bank and Freal against Kindschi and after a bench trial granted a $10,000,000 judgment in favor of FutureSoft and Rardin against Kindschi. Kindschi appeals. We affirm the judgment in favor of the bank and Freal and affirm the liability findings in favor of FutureSoft and Rardin against Kindschi. We reverse the district court's damage award in the latter case, however, and remand for a new trial on the issue of damages due FutureSoft and Rardin.
 
 I. Facts
 
 2
 Kindschi is a financial and investment advisor residing in California. Kindschi primarily offers his clients investments in limited partnerships, formed by himself or others, in real estate, oil and gas equipment, and insurance.
 
 
 3
 Kindschi and Rardin were introduced in 1981. Rardin was then chief operating officer for another corporation that develops software for mainframe computers. That corporation went public in 1981, and Rardin realized a substantial profit by selling his stock in the company. Rardin then went to Kindschi for financial advice and subsequently participated in a number of investments put together by Kindschi.
 
 
 4
 Rardin formed FutureSoft in April 1983 as a venture capital investment company that purchased large blocks of stock in start-up software companies and provided the companies management expertise. FutureSoft's first acquisition was a 51% interest in Strategy Wares, a small company specializing in software for the electric utility industry, for $300,000. Its second investment was $500,000 for a 30% interest in Ganesa Group International, Inc. (Ganesa) in September 1983. Ganesa, a microcomputer software company that specialized in business presentation graphics, statistical and demographic mapping, and micro-mainframe communications, had developed one product that showed particular promise--STATMAP, a computer-generated mapping system. FutureSoft considered Ganesa its "crown jewel," and later exercised an option to purchase an additional 20% of the company for $220,000, bringing its total interest in Ganesa to 50%. FutureSoft's final investment was in options that would allow it to purchase 49% of National Consumer Card Corp., a start-up consumer services company.
 
 
 5
 FutureSoft was capitalized primarily through loans from Rardin. By late 1983, he had loaned FutureSoft almost $1.2 million to enable it to acquire its interests in Strategy Wares and Ganesa. Rardin personally borrowed $500,000 from one Virginia bank and $300,000 from First American as part of the $1.2 million. FutureSoft soon needed additional capital, however, to develop Strategy Wares and Ganesa, which were both losing money, and to invest in additional software companies. Rardin contacted Kindschi in January 1984 about the possibility of a private offering of FutureSoft stock to raise capital, and the two men met at Kindschi's offices in Los Angeles later that month.
 
 
 6
 At the meeting, Rardin forecast a highly profitable future for FutureSoft and predicted Ganesa would go public sometime in 1984 with a value of $20 million. He explained to Kindschi that he needed to raise $3.5 million by April to satisfy FutureSoft's immediate needs for cash, as well as a large personal tax liability.[1] Rardin proposed a private placement of FutureSoft stock by Kindschi's company on a firm commitment basis, i.e., Kindschi's company would be required to purchase any FutureSoft stock that remained unsold at the end of the offering period. Kindschi was also expansive. He boasted of his ability to raise large amounts of capital from investors in a short period of time and expressed an enthusiastic interest in underwriting an offering of FutureSoft stock. The two men agreed that Rardin would immediately begin drafting a summary prospectus for an offering. Kindschi provided Rardin with the summary prospectus from one of Kindschi's recent limited partnership offerings, Turbo Partners, Ltd., and suggested that Rardin use it as a guide.
 
 
 7
 Rardin returned to Virginia and, using the Turbo Partners document as a model, drafted a "summary brochure" for the FutureSoft offering. The summary projected remarkable growth in the value of FutureSoft, but included the usual disclaimers regarding the risks involved and the assumptions underlying the projections. Rardin sent the summary brochure to Kindschi on February 4, 1984. In a letter accompanying the summary, Rardin explained that the document contained "numerous assumptions" and was a "rough draft" to "give you an overall view of the offering and to give us a starting point."
 
 
 8
 Rardin and Kindschi met in Los Angeles for a second time on February 6, 1984. After reviewing the draft summary brochure prepared by Rardin, they discussed the mechanics of a private offering of FutureSoft stock. Rardin indicated a desire to limit the offering to accredited investors,[2] while Kindschi expressed doubts whether the offering could be accomplished as quickly as Rardin hoped. They agreed that Rardin and his lawyers would begin drafting a detailed private placement memorandum to give to potential investors. Because of the expense involved in such an undertaking, Rardin asked Kindschi to sign a letter of intent to underwrite the offering. Kindschi agreed and requested that Rardin draft a suitable letter for his signature.
 
 
 9
 After returning to Virginia, Rardin dictated a letter of intent to Kindschi's secretary over the telephone. Kindschi signed and returned it to Rardin on February 23, 1984. In subsequent conversations, Kindschi pressed Rardin for additional information, such as "best case" and "worst case" financial projections, to help him sell the offering to his clients. Rardin responded on March 6, 1984 with a letter that addressed the areas of concern raised by Kindschi. The letter contained several "off the record" financial projections, without supporting data, and the caveat that the projections were "highly speculative and for discussion purposes only."
 
 
 10
 On March 7, 1984, Rardin's attorneys sent the first draft of the private placement memorandum to Kindschi. Like the earlier summary brochure, the memorandum forecast rapid growth in the value of FutureSoft, projecting an investment of $100,000 in 1984 would be worth $995,000 in 1988. The document explained, however, the speculative nature of its financial projections, the high degree of risk an investor had to be willing to assume, and that FutureSoft and each of its subsidiaries currently had negative stockholders' equity and were losing money--Ganesa alone at the rate of almost $900,000 per year. The letter accompanying the draft memorandum asked Kindschi to review the document and respond with comments and possible changes.
 
 
 11
 On March 16, 1984, Rardin again travelled to Los Angeles to meet with Kindschi. While there, he gave a two-hour presentation on FutureSoft and the stock offering to a number of broker-dealers who occasionally worked in association with Kindschi's firm. After the presentation, Rardin gave Kindschi an Underwriting Agreement drafted by his attorneys. The Agreement provided that Kindschi's firm would sell 35% of FutureSoft's stock for $3.5 million, less commissions. It further stated that the firm would purchase any of the stock that remained unsold after the thirty-day offering period expired. Kindschi apparently never objected to nor sought to negotiate the value placed on the stock by Rardin. Kindschi made two handwritten changes to the agreement and signed it on behalf of his firm. Kindschi and Rardin also discussed FutureSoft's immediate need for cash. Although Kindschi claims that he agreed only to assist FutureSoft in obtaining an interim loan from a California bank, the district court found that Kindschi agreed to loan FutureSoft $1.5 million to satisfy its immediate cash needs.
 
 
 12
 Following a series of letters and phone calls, it became apparent by April 4, 1984 that Kindschi was not going to loan any money to FutureSoft. Kindschi did agree, however, to give his personal guaranty to a loan from First American to FutureSoft, and he sent Rardin his personal financial statement the next day. The loan was to be for only 120 days, as Rardin expected to have the proceeds from the private placement of FutureSoft stock available to repay the loan within that time.
 
 
 13
 In an April 10, 1984 letter to Kindschi, John W. Freal, a corporate loan officer of First American, stated that the bank was considering the interim loan to FutureSoft and, anticipating approval, asked Kindschi to sign and return an attached personal guaranty form. Kindschi signed and returned the guaranty to First American on April 18, 1984. First American approved the $720,000 loan to FutureSoft on April 19, 1984. Rardin accepted the loan and executed his own personal guaranty that same day.
 
 
 14
 On April 30, 1984, Rardin sent Kindschi a revised draft of the private placement memorandum. In a letter accompanying the document, Rardin expressed concern over the slow pace at which Kindschi was proceeding. He called on Kindschi to review the revised memorandum and stated that if he did not receive any proposed changes by May 4, 1984, he would have it printed. In a follow-up telephone call on May 9, Kindschi told Rardin that his associate, Dick Candland, had reservations about the FutureSoft offering. According to Kindschi, the memorandum contained too much "bad news." He told Rardin that he needed the "good news" that was not appropriate for inclusion in the private placement memorandum to reassure Candland and help them sell the offering to their clients. Kindschi, however, did not suggest any changes in the memorandum and approved the final printing of 500 copies. Rardin agreed to send Kindschi favorable material on Ganesa and Strategy Wares and to go to Los Angeles to help sell the offering. Kindschi said he would arrange for Rardin to meet with brokers who sold through him and potential investors throughout the week of May 28, 1984.
 
 
 15
 On May 10, 1984, Rardin sent Kindschi the materials they had discussed the previous day over the telephone. The final private placement memorandum was printed and delivered to Kindschi on May 28, 1984. On May 31, 1984, Kindschi signed an amendment to the Underwriting Agreement. The amendment extended the offering period from thirty days to ninety days after receipt of the final private placement memorandum, increased the firm's commissions on a sliding scale, and reaffirmed the original agreement. During the week of May 28, 1984, Rardin made one presentation to a group of investors in Los Angeles. Kindschi failed to set up additional meetings as promised and, after waiting for several days, Rardin returned to Virginia.
 
 
 16
 In late June or early July 1984, Kindschi learned that a number of his pension fund clients whom he had expected to purchase FutureSoft stock did not meet the requirements for accredited investor status and were prohibited from participating in the offering. A July 9, 1984 letter from Rardin emphasized FutureSoft's now critical need for cash and requested Kindschi forward any proceeds from stock sold in June, as required by the Underwriting Agreement. Concerned over the status of the offering, Kindschi hired a consultant, Robert Stanaway, to evaluate FutureSoft and help sell the offering through Stanaway's connections with major pension funds. Rardin met with Stanaway and Kindschi in Los Angeles on July 16, 1984. Over the next few weeks, Stanaway made an in-depth study of Rardin and FutureSoft. Because FutureSoft was not currently pursuing new investments due to lack of capital, Stanaway focused his study on its subsidiaries and, in particular, Ganesa. He ultimately determined that Ganesa's products were high-quality and that the company had exciting potential as an investment. He found Rardin willing and able to do whatever was necessary to make the venture succeed. From his evaluation of Kindschi's company and its commitments, however, Stanaway informed Kindschi that the company was overextended and, in his opinion, did not have the resources to carry out all of its obligations.
 
 
 17
 In early August, Rardin twice wrote Kindschi stressing the critical need for funds and the quickly approaching due date of the $720,000 loan from First American. He implored Kindschi to complete the offering as agreed and again offered to do whatever was necessary to help.
 
 
 18
 FutureSoft defaulted on the $720,000 loan from First American on August 17, 1984. On August 24, 1984,[3] Kindschi, Kindschi's attorney and Stanaway met with Rardin and Rardin's attorneys in Virginia. The parties discussed the heavy debts of FutureSoft and Rardin and possible ways to restructure the deal. Kindschi proposed financing Ganesa by placing it in C & K Venture I, a venture capital limited partnership being formed by Kindschi and Candland. The meeting ended without an agreement, and Kindschi returned to California and filed suit against Rardin in the United States District Court for the Central District of California on August 28, 1984.[4] Rardin and Kindschi continued to attempt to restructure the offering; however, no agreement was ever reached.
 
 
 19
 On September 28, 1984, First American brought this diversity action against Kindschi in the Eastern District of Virginia to collect on his personal guaranty of the loan to FutureSoft. Kindschi filed a counterclaim against First American and a third-party complaint against FutureSoft, Rardin, and Freal, principally alleging that they had fraudulently induced him to guarantee the loan. Kindschi also sought contribution and indemnity from Rardin and FutureSoft in the event he was found liable to First American for the loan. FutureSoft and Rardin filed a counterclaim against Kindschi alleging, among other things, breach of the Underwriting Agreement.
 
 
 20
 The district court granted Kindschi's motion to sever the third-party complaint and third-party counterclaims that related to FutureSoft and Rardin from the primary case between Kindschi and First American. It subsequently granted summary judgment for First American against Kindschi on his personal guaranty of the loan and awarded the bank $719,869.09 in damages, $40,963.15 in interest, and $66,304.83 in attorneys' fees and costs. The court also granted summary judgment against Kindschi on his counterclaims against First American and his third-party complaint against Freal.
 
 
 21
 Kindschi's third-party claims against FutureSoft and Rardin and their counterclaims against Kindschi were tried to the district court. Following a three day trial, the court dismissed Kindschi's complaint and the majority of FutureSoft and Rardin's counterclaims. However, it entered judgment for FutureSoft and Rardin on its counterclaim that Kindschi's firm had breached the Underwriting Agreement and awarded damages of $10,000,000. Kindschi appealed the district court's decisions in both cases, and this court consolidated his appeals.
 
 
 22
 Kindschi alleges a variety of errors. With respect to First American's judgment against him on his personal guaranty of the loan to FutureSoft, Kindschi contends that the district court erred (1) in finding it had personal jurisdiction over him and (2) in granting summary judgment in favor of First American and Freal. With respect to FutureSoft's judgment against him for breach of the Underwriting Agreement, Kindschi contends the district court erred (1) in finding his firm liable for breach of the Agreement; (2) in finding the breach was also a tort; (3) in determining damages; (4) in holding Kindschi personally liable for his firm's breach; and (5) in denying contribution and indemnity from Rardin and FutureSoft with respect to the loan from First American.
 
 II. First American v. Kindschi
 A. Personal Jurisdiction
 
 23
 The district court held that its exercise of personal jurisdiction over Kindschi pursuant to Virginia's long-arm statute, Va.Code Sec. 8.01-328.1(A)(1), did not violate due process.[5] It ruled that Kindschi had purposefully established the "minimum contacts" in Virginia necessary to satisfy the requirements of due process. See International Shoe Co. v. Washington, 326 U.S. 310 (1945). In reaching its determination, the lower court considered not only Kindschi's personal guaranty of First American's loan to FutureSoft, but also Kindschi's many contacts with Virginia resulting from his underlying agreement with FutureSoft to underwrite the private placement of FutureSoft stock.
 
 
 24
 Kindschi argues that his only contact in Virginia relative to First American and this litigation is his personal guaranty of the loan from First American, a Virginia-based bank. He contends that this single contact with the forum state does not rise to the level of minimum contacts required by due process for the exercise of personal jurisdiction over a non-resident defendant.
 
 
 25
 The district court, however, properly considered the full range of Kindschi's activities in Virginia that related to his guaranty of First American's loan to FutureSoft. Kindschi's guaranty was an integral part of his much broader financial dealings with Rardin and FutureSoft in Virginia. FutureSoft needed capital to continue its operations until Kindschi completed the private placement of FutureSoft stock pursuant to the Underwriting Agreement. In making the $720,000 loan to provide this interim financing, First American relied not only on the personal guaranties of Kindschi and Rardin, but also on Kindschi's firm obligation to sell or buy for himself $3.5 million worth of FutureSoft stock. The loan and Kindschi's guaranty, therefore, were integrally related to the offering of FutureSoft stock. Kindschi surely could have reasonably anticipated that upon the collapse of the stock offering, leaving FutureSoft without funds to repay the interim loan, and his failure to honor his guaranty, he would be haled into court in Virginia. Kindschi purposefully directed his activities at Rardin, FutureSoft and First American and this litigation relates to those activities; therefore, due process is satisfied. See Burger King Corp. v. Rudzewicz, 105 S.Ct. 2174 (1985); World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); Hanson v. Denckla, 357 U.S. 235, 253 (1958); International Shoe, 326 U.S. at 319.
 
 B. Summary Judgment
 
 26
 The district court granted summary judgment in favor of First American and entered judgment against Kindschi for the outstanding amount of the loan plus interest and attorneys' fees. It ruled that Kindschi's allegations that the bank and Freal fraudulently had induced him to guarantee the loan to FutureSoft were unsubstantiated and just "so much smoke." The court, therefore, ruled against Kindschi on his counterclaims against First American and his third-party complaint against Freal.
 
 
 27
 On appeal, Kindschi contends that genuine issues of material fact exist as to each of his three claims of fraud against First American and Freal: (1) that Freal's April 10, 1984 letter to Kindschi contained fraudulent misrepresentations regarding the loan; (2) that First American and Freal breached an affirmative duty to disclose Rardin's financial status to Kindschi; and (3) that the bank and Freal knew of or consented to fraudulent misrepresentations by Rardin.
 
 
 28
 Kindschi could, of course, avoid liability on his guaranty if First American or Rardin, with First American's knowledge or assent, fraudulently misrepresented material facts regarding the transaction. Atlantic Trust & Deposit Co. v. Union Trust & Title Corp., 110 Va. 286, 67 S.E. 182 (1909). There was no obligation on the bank, however, to seek out Kindschi and explain the nature of the obligation, nor was it responsible for any possible misrepresentation by Rardin. Id. at 292, 67 S.E. at 184.
 
 
 29
 Kindschi's principal allegation is that Freal's letter of April 10, 1984 fraudulently misrepresented the status of the loan.[6] Kindschi contends that the phrase "[t]his loan has been agreed to in principle" could be interpreted to mean the loan already had been approved and the bank had determined that Rardin's guaranty alone would be sufficient security for the debt.
 
 
 30
 We agree with the district court that the letter is an accurate and unambiguous presentation of the undisputed facts. It states at several points that the loan is under consideration, requires the approval of the bank's Executive Committee, and its terms are subject to change. The interpretation placed on the letter by Kindschi is entirely unreasonable and, since there were otherwise no genuine factual issues, summary judgment was proper as to this claim. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2510 (1986); Morrison v. Nissan Motor Co., 601 F.2d 139, 141 (4th Cir.1979).
 
 
 31
 With respect to Kindschi's second claim of fraud, there is simply no merit to Kindschi's contention that First American had a duty to disclose Rardin's financial status to him. In re Decker, 225 F.Supp. 716, 719-20 (W.D.Va.1964); Atlantic Trust & Deposit Co., 110 Va. at 292, 67 S.E.2d at 184.
 
 
 32
 Finally, Kindschi contends that the district court improperly resolved factual issues with respect to his claim that Freal knew or assented to fraudulent misrepresentations by Rardin concerning the loan. In his affidavit, however, Freal denied that he was aware of any alleged misrepresentations or fraudulent conduct by Rardin, and Kindschi failed to present any evidence from which a reasonable jury might return a verdict in his favor on this claim. See Liberty Lobby, 106 S.Ct. at 2514-15. Under the circumstances, summary judgment against Kindschi was proper.
 
 III. Kindschi v. Rardin/FutureSoft
 A. Breach of the Underwriting Agreement
 
 33
 The district court held Kindschi liable for breach of the Underwriting Agreement because he failed to sell or buy the FutureSoft stock for $3.5 million. On appeal, Kindschi concedes, as he must, that he did not perform his obligations under the Agreement. He contends, however, that his nonperformance of the Agreement is excused because (1) use of the private placement memorandum prepared by FutureSoft to sell the stock would have violated federal and state securities laws and (2) FutureSoft failed to perform conditions precedent contained in the Agreement.
 
 
 34
 Kindschi relies on the general rule that a contract whose performance would be illegal is unenforceable. He argues that using the private placement memorandum prepared by FutureSoft to sell the stock would have violated Section 12(2) of the Securities Act of 1933, 15 U.S.C. Sec. 771(2), and its state counterpart, Cal.Corp.Code Sec. 25501. Section 12(2) provides civil liability for any person who sells a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading." Kindschi argues that the memorandum was misleading because it omitted material facts regarding the nature of FutureSoft's business and its prospects for future success. Since the use of a misleading document would have violated section 12(2), Kindschi contends the Underwriting Agreement is unenforceable. Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838 (2d Cir.), cert. denied, 344 U.S. 856 (1952) (underwriting agreement unenforceable where a misleading prospectus would be used in public offering).
 
 
 35
 The Supreme Court set out the standard for determining whether a fact is "material" in the context of securities litigation in TSC Industres, Inc. v. Northway, Inc., 426 U.S. 438 (1976):
 
 
 36
 An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.
 
 
 37
 Id. at 449 (footnote omitted). In the instant case, the district court held that the "litany of omissions recounted by Kindschi's securities expert are not convincing as matters which, had they been revealed, would have made a difference...." Since, this was essentially a factual determination by the district court, our review of the district court's findings must be pursuant to the clearly erroneous standard. Fed.R.Civ.P. 52(a); Toombs v. Leone, 777 F.2d 465, 469 (9th Cir.1985). See Anderson v. City of Bessemer City, 105 S.Ct. 1504, 1510-11 (1985); tenBraak v. Waffle Shops, Inc., 542 F.2d 919, 922 (4th Cir.1976); Jones v. Pitt County Board of Education, 528 F.2d 414, 417-18 (4th Cir.1975).
 
 
 38
 Kindschi's principal contention is that the memorandum was misleading because it failed to disclose a material change in the nature of FutureSoft's business. He argues that by May of 1984, FutureSoft was no longer a venture capital investment company, as described in the private placement memorandum, because it had ceased investing in any new microcomputer software companies due to lack of capital. While admittedly true, we fail to see how this fact caused the private placement memorandum to be misleading. The memorandum clearly reveals that, as of the date of the offering, FutureSoft did not have the capital necessary for new investments. A primary purpose of the offering was to raise those funds:
 
 
 39
 Although the Company has made venture capital investments in two companies, presently comprising in value approximately 94% of FutureSoft's total assets, the Company has yet to identify the small businesses in which it will invest the proceeds of this offering allocated to future investments. Accordingly, investors are asked to commit their funds without any knowledge of the identity of the businesses which will comprise a portion of the Company's portfolio.
 
 
 40
 We fail to see how a potential investor could have been mislead as to the nature and status of FutureSoft's business. At any rate, we cannot say that the district court was clearly erroneous in its determination.
 
 
 41
 Neither was the court clearly erroneous in finding that the financial projections contained in an appendix to the private placement memorandum were not misleading. Kindschi asserts that the projections of the future value of FutureSoft's stock were speculative and based on incorrect assumptions. Specifically, he notes that the projections assumed Ganesa would make a public offering of its stock in the fall of 1984, while Rardin admitted that by June of 1984 he intended Ganesa to go public in "six to twelve months." Although Rardin's testimony indicates a slight delay in his plans to take Ganesa public, we do not believe that the district court was clearly erroneous in finding that this fact did not "significantly alter[] the 'total mix' of information made available." TSC Industries, 426 U.S. at 449. The private placement memorandum warned that investors should purchase FutureSoft stock only for long-term investment as the shares would provide no immediate cash return. In this context, we do not think such a slight delay would have significantly affected an investor's deliberations. The memorandum disclosed the assumptions used to make the projections and, more importantly, there are numerous warnings throughout the memorandum of the high degree of risk involved in the investment.[7] Accordingly, use of the private placement memorandum to sell the FutureSoft stock would not have violated section 12(2) of the Securities Act of 1933, 15 U.S.C. Sec. 771(2).
 
 
 42
 Also without merit is Kindschi's contention that his failure to perform the Underwriting Agreement is excused by FutureSoft's nonperformance of a condition precedent. The Agreement required FutureSoft to notify Kindschi and to supplement the private placement memorandum in the event of any occurrence that caused the memorandum to become misleading. The crux of Kindschi's argument is that FutureSoft breached this obligation by failing to disclose the allegedly material facts discussed supra. As we have indicated, the district court's finding that those facts were not material is not clearly erroneous. The district court properly held Kindschi liable for breach of the Underwriting Agreement.
 
 B. Tort Liability
 
 43
 The district court further held that Kindschi was subject to tort liability because he sought to avoid liability for his firm's breach of the Underwriting Agreement by denying, in bad faith and without probable cause, that the contract existed. Seaman's Direct Buying Service, Inc. v. Standard Oil Co. of California, 36 Cal.3d 752, 206 Cal.Rptr. 354, 686 P.2d 1158, 1167 (1984). In Seaman's, the California Supreme Court specifically found that "adopting a 'stonewall' position ('see you in court') without probable cause and with no belief in the existence of a defense" was sufficient to give rise to tort liability.[8] Id. The district court found that Kindschi acted in bad faith by adopting essentially the same position. The court noted that an attorney advised Kindschi "to stonewall" in his dealings with Rardin and that Kindschi did not deny his obligations under the Underwriting Agreement nor assert any defenses until the present lawsuit was filed.[9] Further, the district court found that "as early as June, 1984 Kindschi was having a change of heart as to performing the Underwriting Agreement. Yet he made no revelation of this to Rardin, and indeed led Rardin to believe he still intended to perform it."
 
 
 44
 The court's finding of bad faith on the part of Kindschi is one of fact and thus is subject to a clearly erroneous standard of review. Fed.R.Civ.P. 52(a). See Anderson v. City of Bessemer City, 105 S.Ct. at 1510-11; Waffle Shops, 542 F.2d at 922; Pitt County Board of Education, 528 F.2d at 417-18. Kindschi argues there was no bad faith because he did not deny the contract prior to litigation. While it is true that Kindschi did not deny his contract obligations until litigation began, the district court found that this was part of his "stonewalling" efforts and constituted bad faith because Kindschi did not inform Rardin promptly of his intention to breach or of any defense to performance. We cannot say that the district court's conclusion of bad faith is clearly erroneous. Therefore, we affirm the district court's holding of tort liability against Kindschi.
 
 C. Personal Liability
 
 45
 Likewise, we affirm the district court's holding that Kindschi is personally liable for both the breach of contract and tort claims. The court correctly noted that an agent such as Kindschi is personally liable for a tort committed within the scope of his authority while acting for his principal. Cal.Civ.Code Sec. 2343(3) (West 1985); Stoiber v. Honeychuck, 101 Cal.App.3d 903, 929-30, 162 Cal.Rptr. 194, 208 (1980); Bayuk v. Edson, 236 Cal.App.2d 309, 320, 46 Cal.Rptr. 49, 56 (1965). The court found that Kindschi's actions fit that classic pattern. While acting within the scope of his authority, he entered into the Underwriting Agreement on behalf of his company and then tortiously denied the validity of the contract, as discussed in the previous section. Again, the district court was not clearly erroneous in this factual conclusion, which it applied to a hornbook principal of law.
 
 
 46
 The district court's alternative ruling "piercing the corporate veil" to hold Kindschi personally liable for the breach of contract is also sound. See generally Mesler v. Bragg Management Co., 39 Cal.3d 290, 216 Cal.Rptr. 443, 702 P.2d 601, 606-07 (1985); Automotriz etc. De California v. Resnick, 47 Cal.2d 792, 796, 306 P.2d 1, 3 (1957); Arnold v. Browne, 27 Cal.App.3d 386, 394, 103 Cal.Rptr. 775, 781 (1972), overruled on other grounds, Reynolds Metals Co. v. Alperson, 25 Cal.3d 124, 158 Cal.Rptr. 1, 599 P.2d 83 (1979). The evidence that the court considered was certainly "substantial." Id. at 394, 103 Cal.Rptr. at 781; Carlesimo v. Schwebel, 87 Cal.App.2d 482, 491, 197 P.2d 167, 173 (1948). Kindschi was the owner and sole officer, director, and shareholder of the company; the corporation was grossly undercapitalized with contributed capital of approximately $2,000; the company retained no earnings except to pay expenses, but paid out income immediately as commissions to salespeople and has never paid any dividends; and ownership of assets between Kindschi and the corporation was blurred. We, therefore, affirm the district court's holding Kindschi personally liable.
 
 D. Claims for Contribution and Indemnity
 
 47
 Kindschi argues that he has an absolute statutory right to contribution from Rardin, Va.Code Sec. 49-27 (1980), and an absolute right under Virginia case law to indemnification by FutureSoft on his liability to First American. Neither the statute nor the cases he cites support his position. Indemnity and contribution are based upon principles of natural equity and justice. See Richards v. Musselman, 221 Va. 181, 267 S.E.2d 164 (1980) (deciding whether right of contribution under a guaranty agreement is barred by applying the equitable maxim of "unclean hands"); Dickinson v. Charles, 173 Va. 393, 4 S.E.2d 351 (1939); Michie's Jurisprudence, Contribution and Exoneration, Section 11 (1986). The enactment of Sec. 49-27 of the Virginia Code did not change the equitable nature of contribution and indemnification, but created an additional remedy subject to the same equitable principles. See In re Worley, 251 F.Supp. 725 (W.D.Va.1966) (applying equitable principles to Sec. 49-27 in denying contribution and indemnification of an accommodation party to a note).
 
 
 48
 The district court found that Kindschi's actions in not making FutureSoft the $1.5 million interim loan created the need for the bank loan and that his breach of contract directly prevented repayment of the loan. It concluded that he therefore was not entitled to the equitable remedies of indemnity and contribution. We agree.
 
 E. Damages
 
 49
 The issue of the appropriate measure of damages owed by Kindschi to FutureSoft, however, causes us difficulty. The district court awarded FutureSoft ten million dollars in damages for the breach of the Underwriting Agreement and for the tort liability. On appeal, Kindschi argues alternatively that the court applied the wrong measure of damages, that if it was the correct measure the district court applied it incorrectly, and that there was insufficient evidence to support a damage award of $10 million. We think the district court applied a proper measure of damages; however, we agree that the district court erred in its application and that there was insufficient evidence to support an award of $10,000,000.
 
 
 50
 The court here applied the measure of damages used in K.M.C. Co., Inc. v. Irving Trust Co., 757 F.2d 752 (6th Cir.1985), which was the difference in the going concern value of the company before and after the breach, or diminution in value. This appears to be consistent with the general California damage rule. There, the general measure of damages for breach of contract is "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Cal.Civ.Code Sec. 3300 (West 1970). The California measure of damages for tort liability is "the amount which will compensate for all detriment proximately caused thereby, whether it could have been anticipated or not." Cal.Civ.Code Sec. 3333 (West 1970). The trial court correctly determined that the damages in this case would be identical under either measure since the same underlying facts supported both the contract and tort liability and there were no "unanticipated" damages. As such, the court calculated one amount of damages to compensate for all of FutureSoft's injuries.
 
 
 51
 The manner in which the district court applied the damage rule, however, requires reversal. It recognized the correct measure of damages but applied it erroneously. Under the Irving Trust measure, the going concern value of the company immediately before the breach is the crucial information. Irving Trust, 757 F.2d at 764. The district court, however, neglected to determine when the breach occurred. It could have occurred as late as August, when the offering expired, or as early as June, when Kindschi first had doubts about fulfilling the Underwriting Agreement. The breach obviously did not occur in March because the agreement was executed on March 16 and Kindschi and Rardin optimistically continued the project throughout the month. Yet, it was in March that the parties established the value of $3.5 million for 35% of the stock. There is no evidence carrying that value forward to June or August or to any other suggested date of breach. The district court, therefore, erred in calculating the damages when it used the purported value of FutureSoft in March 1984 rather than at the date the Agreement was breached.
 
 
 52
 The paucity of damages evidence presents an additional ground for reversal. As long as a district court applies the correct legal principle, our review of its damages award is governed by the clearly erroneous standard. Little Beaver Enterprises v. Humphreys Railways, Inc., 710 F.2d 75, 79 (4th Cir.1983). See also Woods v. United States, 724 F.2d 1444, 1451 (9th Cir.1984); Maxey v. Butchers' Union Local No. 126, Amalgamated Meat Cutters and Butchers Workmen of North Carolina, AFL-CIO, 627 F.2d 912, 915 (9th Cir.1980). An award of damages by the trial court will not be overturned unless it is clear that the evidence does not support it. DeWitt v. Western Pacific R. Co., 719 F.2d 1448, 1451 (9th Cir.1983); Flores v. Pierce, 617 F.2d 1386, 1392 (9th Cir.), cert. denied, Autry v. Flores, 449 U.S. 875 (1980). Here, however, the evidence was deficient even under that standard. There was simply not enough evidence to support an award of $10,000,000.
 
 
 53
 Kindschi's agreement to sell 35% of the stock for $3.5 million, Rardin's testimony of FutureSoft's value based on assumptions and projections of future growth, and the private placement memorandum were the only evidence presented at trial that related directly to the value of FutureSoft. The testimony on the value that Ganesa could have reached absent the breach was speculative at best and only tangentially related to FutureSoft's value immediately before the breach. Due to the inadequacy of the evidence presented on FutureSoft's value, a damage award of $10,000,000 is inherently speculative and clearly erroneous.
 
 
 54
 Because of the lack of evidence, the court relied on the contract price for the FutureSoft stock as a substitute for the going concern value of FutureSoft. It reasoned that if 35% of the stock was to be sold for $3.5 million, 100% would be worth at least $10 million, and, that, therefore, the value of FutureSoft before breach was $10 million. This reasoning is flawed. First, as the district court recognized, the market value of the stock of a company is at most only an approximation of its going concern value. Second, the price of $3.5 million for 35% of the stock, increased proportionately, cannot be termed the market price for 100% of the stock. The agreement to market 35% of the stock was a discrete agreement between two promoters in a highly speculative venture. It is some evidence, but certainly of itself is not the quality nor quantity of evidence from which the entire value of the corporation could be gauged.
 
 
 55
 We note that the district court itself early recognized the lack of evidence to prove damages, commenting at the close of the trial:
 
 
 56
 Your damage testimony is sketchy, frankly. What we are talking about here is money.
 
 
 57
 ...
 
 
 58
 I must say that the damage testimony leaves something to be desired. It may be that these people deal in such big figures that when they tell me it's 1.6 or 1.8 million or it's a couple hundred thousand dollars, now that may be the way these people deal with these sorts of figures. But that's not a very sound basis to rest a damage award on.... I haven't obviously reached the point yet, but in case I do, I foresee some problems with it.
 
 
 59
 The court's initial instincts were correct, and it should have required the parties to produce more evidence relating to the date of breach and evidence of the value of FutureSoft as a going concern at that time.
 
 
 60
 Kindschi breached a contract to underwrite a $3.5 million offering of FutureSoft stock on a firm commitment basis. It is apparent therefore that FutureSoft is entitled to a minimum of $3.5 million in damages. An award of compensatory damages greater than that amount, however, must be based on more specific evidence than the speculations and projections Rardin offered at trial. For example, there must be sufficient evidence of the date of breach and FutureSoft's value immediately before the breach if its diminution in value is to be calculated accurately. We, therefore, vacate the district court's damage award and remand for a new trial limited to the proper award of damages.
 
 IV. Summary of Holdings
 
 61
 To recapitulate, we affirm the district court's holding on all issues except damages. Specifically, we affirm the exercise of personal jurisdiction over Kindschi and the grant of summary judgment for Freal and First American in its suit against Kindschi. With respect to FutureSoft and Rardin's counterclaims against Kindschi, we affirm the finding of breach of the Underwriting Agreement and tort liability based on Kindschi's bad faith denial of the contract. We further affirm the district court's decision to hold Kindschi personally liable for the damages arising out of these breaches and to deny Kindschi the equitable remedies of indemnity and contribution for the judgment against him on his personal guaranty. We vacate the district court's decision on damages and remand for a new trial limited to the proper award of damages consistent with our decision in this case.
 
 
 62
 AFFIRMED IN PART, VACATED AND REMANDED IN PART.
 
 
 63
 HALL, Circuit Judge, concurring in part and dissenting in part:
 
 
 64
 I agree with the majority's conclusion that the district court properly exercised personal jurisdiction over Kindschi, and properly granted summary judgment for Freal and First American Bank in their suit against Kindschi. I also agree with the majority's affirmance of the district court's finding that Kindschi breached the Underwriting Agreement and was liable in tort for his bad faith denial of the contract. Finally, I agree with the majority's determination that a remand is necessary to determine the proper award of damages.
 
 
 65
 I cannot agree that FutureSoft is entitled to at least $3.5 million or any other minimum amount. I disagree further with the majority's conclusion that Kindschi is not entitled to contribution from Rardin or indemnification by FutureSoft with respect to his liability to First American Bank as FutureSoft's guarantor. The denial of these remedies in this instance makes Kindschi liable not only for the diminution in value of FutureSoft, but also for FutureSoft's $1.5 million corporate loan--a double recovery for that amount by FutureSoft--a $1.5 million windfall.
 
 
 66
 The majority suggests that FutureSoft should be absolved from indemnification and contribution on the Bank loan, because the Company would never have requested the Bank loan had Kindschi fulfilled his promise to lend FutureSoft the necessary funds. Although it is true that FutureSoft would not have had to repay a loan to the Bank had this promise been kept, it clearly would have been liable to Kindschi on the loan. Therefore, Kindschi's failure to provide the loan did not increase FutureSoft's liabilities, but only substituted another creditor in his place. In my view, this does not justify the denial of indemnification and contribution in this case.
 
 
 67
 Neither Kindschi nor Rardin is an inexperienced businessman. Therefore, I see no reason to penalize Kindschi by awarding FutureSoft more than is necessary to compensate it for the diminution in the value of the company. The company's post-breach "value," as I see it, is comprised of FutureSoft's total assets, minus all of its liabilities, without regard to whom the liabilities are owed.
 
 
 
 [1]
 Rardin planned to use part of the proceeds from an offering of FutureSoft stock to repay some of the nearly $1.2 million he had loaned the company, thus providing him with funds to meet a large personal tax liability coming due in April
 
 
 [2]
 Sales of securities to accredited investors may be exempt from the registration requirements of section 5 of the Securities Act of 1933, 15 U.S.C. Sec. 77d(6) (1982). See 15 U.S.C. Sec. 77e (1982); 17 C.F.R. Sec. 230.501 et seq. (1986). Such sales, however, are not exempt from the antifraud or general civil liability provisions of the securities laws. See, e.g., 15 U.S.C. Sec. 771(2) (1982)
 
 
 [3]
 It is uncertain whether this was before or after the offering period closed. The amendment to the Underwriting Agreement states that Kindschi's firm "will have 90 days upon receipt of the finalized printed Investor Memorandum in which to sell such shares;" since Kindschi received the final memorandum on May 28, the offering would close August 26. However, the amendment also provides for transfer of subscription money and a decreasing commission based on the date of the memorandum (May 22, 1986), rather than its receipt, creating an ambiguity as to the closing date of the offering. The district court found that May 22 was the date on which selling could begin and therefore the closing date was August 22. Even using May 22 as the opening date, however, August 20 should be considered the closing date since it is 90 days after May 22
 
 
 [4]
 It is unclear from the record what the status of this case is
 
 
 [5]
 Virginia Code Sec. 8.01-328.1 et seq. (1984) has been construed to extend personal jurisdiction to the outermost limits of federal due process. Peanut Corp. of America v. Hollywood Brands, Inc., 696 F.2d 311, 313 (4th Cir.1982). We therefore confine our inquiry to whether the exercise of personal jurisdiction in this case violates the federal standard of due process
 
 
 [6]
 The letter stated:
 Dear Mr. Kindschi:
 First American Bank of Virginia is considering a loan to FutureSoft Synergies, Inc. which will serve as interim financing pending the closing of a private placement of its equity securities. Mr. Kenneth D. Rardin has indicated that you will personally guarantee this loan in addition to himself.
 This loan has been agreed to in principle by First American but requires the formal approval of its Executive Committee. The Executive Committee will consider this loan April 19, 1984. I expect the terms, which are subject to change, to include a one hundred-twenty (120) day term, (with the note due upon receipt of the placement funds by FutureSoft if sooner) with an interest rate of First American Bank of Virginia Prime Rate plus 1%.
 In anticipation of this approval, I have included a personal guarantee form, which requires execution where noted and notarization. This can be returned in the envelope provided. A copy of the note form to be used is also included. You will receive a copy of the note upon closing the loan.
 If you have any questions, feel free to call me at 821-7666.
 Sincerely,
 FIRST AMERICAN BANK OF VIRGINIA
 /s/ John W. Freal
 John W. Freal
 Corporate Banking Officer
 JWF/teb
 Enclosures
 cc: Mr. Kenneth D. Rardin
 
 
 [7]
 For example, the financial projections carried the following caveat:
 THIS ILLUSTRATION HAS BEEN PREPARED BY FUTURESOFT SOLELY BASED UPON ASSUMPTIONS WHICH IT BELIEVES TO BE REASONABLE IN CONSIDERATION OF CURRENT CIRCUMSTANCES. HOWEVER, IT MAY NOT BE POSSIBLE TO CREATE EITHER A PRIVATE OR A PUBLIC MARKET FOR THE SECURITIES OF THESE COMPANIES, THEREFORE MAKING THESE PROJECTIONS INHERENTLY SPECULATIVE. EACH INVESTOR SHOULD READ CAREFULLY THE FOOTNOTES ON THE FOLLOWING PAGES IN CONJUNCTION HEREWITH. THIS FORECAST IS AN ESTIMATE AND RESULTS MAY VARY THEREFROM. NO REPRESENTATION OR WARRANTIES ARE MADE REGARDING THE ACCURACY, COMPLETENESS, OR ATTAINMENT OF THIS OR ANY FORECAST. FURTHERMORE, NO CONSIDERATION HAS BEEN GIVEN FOR ANY INCOME TAX UPON THE SALE.
 
 
 [8]
 In Seaman's, the California Supreme Court ultimately reversed the judgment because the trial court failed to distinguish in its jury instructions between bad faith and good faith denial of liability under a contract. 686 P.2d at 1167-70
 
 
 [9]
 A note by Stanaway of the conversation between Kindschi and his attorney lists the following:
 Options
 
 
 [1]
 Drop deal--stonewall
 
 
 [2]
 Suit in abeyance
 talk
 (a) deal we were on before is dead--recinded (sic)--
 square 1
 (b) litigation exposure
 exposure to bank
 --we'll buy our way out paydown bank--total release--we walk away.
 (c) put up to buy off for releases get (illegible) his releases.